Michael J. Gayan
**Claggett & Sykes Law Firm**
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
Tel. (702) 655-2346
mike@claggettlaw.com

Douglas J. McNamara*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
8th Floor
Washington, D.C. 20005
Tel. (202) 408-4600
dmcnamara@cohenmilstein.com

James J. Pizzirusso*
**HAUSFELD LLP**
1201 17th Street N.W., Suite 600
Washington, D.C. 20036
Tel. (202) 540-7200
jpizzirusso@hausfeld.com

Amy Keller*
**DICELLO LEVITT LLP**
10 North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214-7900
akeller@dicellolevitt.com

**Pro Hac Vice applications forthcoming*
*Counsel for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| TRENT BERGER and PARTHENA VORGIATZIDIS, *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>BOYD GAMING CORPORATION,<br><br>Defendant. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PARTIES .......... 3

- A. Plaintiffs .......... 3
- B. Defendant .......... 3

III. JURISDICTION AND VENUE .......... 3

IV. STATEMENT OF FACTS .......... 4

- A. Boyd's Business .......... 4
- B. The Boyd Data Breach .......... 6
- C. Boyd Uses Consumers' PII for Profit-Generating Purposes .......... 7
- D. Boyd's Privacy Policy Represents That It Will Adequately Protect PII .......... 9
- E. Boyd Knew or Should Have Known it Faced a Serious Threat From and Was a Likely Target of Cybercriminals .......... 12
- F. Boyd Failed to Comply with Established Cybersecurity Frameworks and Industry Standards. .......... 13
- G. Plaintiffs and Class Members Suffered Damages .......... 16
- H. Criminals Will Continue to Use Class Members' Stolen PII for Years .......... 20
- I. PII Stolen in This Data Breach Can be Combined with Data Acquired Elsewhere to Commit Identity Theft .......... 21
- J. Plaintiffs and Class Members are Entitled to Injunctive Relief .......... 23

V. CLASS ACTION ALLEGATIONS .......... 24

VI. CAUSES OF ACTION .......... 27

- NEGLIGENCE .......... 27
- BREACH OF IMPLIED CONTRACT .......... 30
- UNJUST ENRICHMENT .......... 32
- VIOLATION OF THE NEVADA CONSUMER FRAUD ACT .......... 33
- VIOLATION OF THE VIRGINIA PERSONAL INFORMATION BREACH NOTIFICATION ACT .......... 36

VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT ... 37
VII. REQUEST FOR RELIEF ... 40
VIII. DEMAND FOR JURY TRIAL ... 41

Plaintiffs Trent Berger and Parthena Vorgiatzidis (together "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class Members"), bring this Class Action Complaint against Boyd Gaming Corporation ("Boyd" or "Defendant"), and allege as follows based on personal knowledge as to himself and his own acts and experiences and upon information and belief as to all other matters, including the investigation of counsel.

## I. INTRODUCTION

1. This action arises from a significant data breach ("the Data Breach") involving Defendant Boyd which has compromised the personally identifiable information ("PII") of Plaintiffs Trent Berger Parthena Vorgiatzidis and a proposed class of similarly situated individuals.

2. Boyd operates a nationwide portfolio of casino and hospitality properties and collects, stores, and uses personal information from customers and employees to deliver services, manage loyalty and employment programs, process payments, and comply with regulatory requirements. The categories of information retained by Boyd include names, addresses, dates of birth, and Social Security numbers. Boyd's "Boyd Rewards" loyalty program likewise entails collecting and retaining members' personal information in Boyd's systems. As pleaded, Plaintiffs and the two proposed Nationwide Classes are current and former Boyd employees and/or Boyd Rewards members/customers whose information was entrusted to Boyd in connection with those operations.

3. On or about September 23, 2025, Boyd publicly acknowledged the Data Breach in a Form 8-K filing, stating that it "recently experienced a cybersecurity incident in which an unauthorized third party accessed our internal IT system," and, further, that "the unauthorized third party removed certain data from [Boyd's] IT systems, including information about employees and a limited number of other individuals."

4. In its Data Breach notification letters—which went out the following day, on September 24, 2025—Boyd explained that it learned of the Data Breach on September 6, 2025, and determined that, between September 5, 2025 and September 7, 2025, an unauthorized actor exfiltrated the PII of Plaintiffs and Class Members, including names, dates of birth, and social

security numbers.[1]

5. In other words, as a result of the Data Breach, which Boyd failed to prevent, the PII of individuals, including Plaintiffs and Class Members, was stolen and is now in the hands of a malicious threat actor.

6. Boyd has shown a blatant disregard for the rights of Plaintiffs and Class Members by failing to implement reasonable measures to safeguard their PII. Despite being aware of the risks associated with data breaches, Boyd neglected to take adequate steps to protect its data systems and prevent unauthorized disclosure of sensitive information, leaving Plaintiffs and Class Members vulnerable to present and future harm.

7. Plaintiffs and Class Members have suffered and continue to suffer numerous harms, including increased and continuing risk of identity theft and fraud; loss of time and out-of-pocket expenses to prevent, detect, and remediate misuse of their personal information; invasion of privacy; anxiety and distress; diminution in the value of their personal information; and loss of the benefit of their bargain with Boyd, whose services they expected to be accompanied by reasonable data security.

8. Plaintiffs and Class Members would not have provided their valuable Private Information to Boyd had they known that Boyd would make their PII Internet-accessible and not encrypt personal and sensitive data elements or delete the PII it no longer had reason to maintain.

9. Through this lawsuit, Plaintiffs seek to hold Boyd responsible for the injuries it inflicted on Plaintiffs and Class Members due to its impermissibly inadequate data security measures, and to seek injunctive relief to ensure the implementation of security measures to protect the PII that remains in Boyd's possession.

---

[1] In the notice to the Maine Attorney General that went out a few days later, however, Boyd's counsel admits additional categories of exfiltrated information not mentioned in the consumer notice, including "addresses, . . . driver's license information, [and] other government-issued identification information." *Data Breach Notifications: Boyd Gaming Corporation*, Me. Att'y Gen. (Oct. 1, 2025) https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cc4943dd-1067-4966-a6ef-338666abc3d9.html.

## II. PARTIES

### A. Plaintiffs

10. Plaintiff Parthena Vorgiatzidis is a resident of Clark County, Nevada, and a former employee of the Defendant, Boyd Gaming Corporation. She received a notice that her data had been exposed by the Data Breach on or shortly after September 24, 2025.

11. Plaintiff Trent Berger is a resident of Fairfax County, Virginia, and a member of the Boyd Rewards program. He received a notice that his data had been exposed by the Data Breach on or shortly after September 24, 2025.

### B. Defendant

12. Defendant Boyd Gaming Corporation is a publicly traded corporation with its principal place of business at 6455–6465 S. Rainbow Blvd., Clark County, Las Vegas, Nevada 89118. Boyd is a nationwide hospitality and gaming company that owns, operates, and manages hotels, casinos, and resorts in ten states: Nevada, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Ohio, and Pennsylvania. Boyd's portfolio of Las Vegas properties includes the Gold Coast Hotel and Casino, The Orleans Hotel and Casino, Sam's Town Hotel and Gambling Hall, Suncoast Hotel and Casino, Eastside Cannery Casino and Hotel, Aliante Casino + Hotel + Spa, Cannery Casino Hotel, and the Jokers Wild.[2] Boyd's net revenue in 2024 was approximately $3.9 billion and net income was approximately $578 million.[3]

## III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds

---

[2] *See* Boyd Gaming Corporation Form 10-K for the year ended Dec. 31, 2024, at 3 (Feb. 21, 2025), https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318941284&type=PDF&symbol=BYD&cdn=2b207d13b21b79cee7b4b5d4512d2f9e&companyName=Boyd+Gaming+Corporation&formType=10-K&dateFiled=2025-02-21.

[3] *See* BOYD GAMING REPORTS FOURTH-QUARTER, FULL-YEAR 2024 RESULTS (Feb. 6, 2025), https://investors.boydgaming.com/2025-02-06-BOYD-GAMING-REPORTS-FOURTH-QUARTER,-FULL-YEAR-2024-RESULTS.

$5,000,000 exclusive of interest and costs, there are more than 100 Class Members, and several Plaintiffs and at least one Class member is a citizen of a state different than Defendant.

14. This Court has general personal jurisdiction over Boyd because Boyd maintains its principal place of business in this District. This Court also has specific personal jurisdiction over Boyd because Boyd engaged in the conduct underlying this action in this District, including the collection, storage, and inadequate safeguarding of Plaintiffs' PII.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Boyd is based in this District, entered into consumer transactions with Plaintiffs in this District, and made its data security decisions leading to the Data Breach in this District.

## IV. STATEMENT OF FACTS

### A. Boyd's Business

16. Boyd operates a nationwide portfolio of casino and hospitality properties.

17. To deliver services, manage loyalty and employment programs, process payments, and comply with regulatory requirements, Boyd collects, stores, and uses PII from customers and employees, including names, addresses, dates of birth, and Social Security numbers.

18. Boyd's loyalty program, Boyd Rewards, allows members to earn benefits when they play slots and table games at any Boyd Rewards property, and which can be used at all Boyd Rewards locations nationwide, including on the Las Vegas Strip.[4]

19. Plaintiffs and Class Members are current and former Boyd Rewards members and/or employees of Boyd.

20. As a condition of receiving its products and/or services, Boyd requires that its Boyd Rewards members, including Plaintiffs and Class Members, entrust it with highly sensitive personal information such as their full legal name, full address, date of birth, drivers' license number, and Social Security number.

---

[4] Boyd Rewards Program, *Frequently Asked Questions*, https://rewards.boydgaming.com/faq#f1 (last visited Oct. 2, 2025).

21. Similarly, as a condition of employment, Boyd requires that its employees entrust it with highly sensitive personal information such as their full legal name, full address, date of birth, drivers' license number, and Social Security number.

22. The information held by Boyd in its computer systems or those of its vendors at the time of the Data Breach included the unencrypted PII of Plaintiffs and Class Members.

23. Boyd's business model monetizes the use of PII for customer relationship management, analytics, targeted marketing, and operational decision-making. Boyd retains its rewards members' PII for extended periods, including after a customer relationship or employment ends.

24. Because PII like Social Security numbers and dates of birth is highly sensitive and valuable to cybercriminals, and because the casino and hotel industry has been a frequent target of cyberattacks, Boyd knew or should have known that strong, reasonable security controls were necessary to protect the PII it collected and maintained.

25. Boyd made promises and representations to its customers and employees, including Plaintiffs and Class Members, that the PII collected from them would be kept safe, confidential, that the privacy of that information would be maintained, and that Boyd would delete any sensitive information after it was no longer required to maintain it.

26. Plaintiffs and Class Members provided their PII to Boyd with the reasonable expectation and on the mutual understanding that Boyd would comply with its obligations to keep such information confidential and secure from unauthorized access.

27. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class Members relied on the sophistication of Boyd to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

28. Boyd had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the

integrity of its IT vendors and affiliates. Boyd has a legal duty to keep the PII it stored safe and confidential.

29. Boyd had obligations created by the FTC Act, state law, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

30. Boyd derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Boyd could not perform the services it provides. Plaintiffs' and Class Members' PII has an independent value to Boyd.

31. Because of its use of Plaintiffs' and Class Members' PII, Boyd sold more services and products than it otherwise would have.

32. Boyd was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create using Plaintiffs' and Class Members' PII to the detriment of Plaintiffs and Class Members.

33. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Boyd assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

**B. The Boyd Data Breach**

34. On or about September 6, 2025, Boyd detected suspicious activity within its network.

35. An investigation confirmed that unauthorized actors accessed Boyd's systems between September 5 and September 7, 2025, and acquired files containing PII.

36. The compromised data included, at minimum, immutable PII, including names, dates of birth, and Social Security numbers.

37. Boyd began notifying impacted individuals around September 24, 2025. The notice provided limited details about how the breach occurred, and did not include the specific security failures exploited, the total number of individuals affected, or the complete scope of the compromised data beyond the categories disclosed.

38. Boyd's delayed and incomplete disclosure hindered Plaintiffs and Class Members from promptly taking protective measures such as placing credit freezes, fraud alerts, monitoring accounts, and obtaining identity protection services.

39. The PII taken is permanent and immutable; it cannot be changed like a password. The exposure creates a continuing and heightened risk of identity theft, new account fraud, tax refund fraud, medical identity theft, and targeted phishing and social engineering.

40. Threat actors gained access to Boyd's inadequately secured data IT network September 5, 2025, but Boyd did not disclose the Breach to the public or affected individuals for almost three weeks.

41. On or around September 23, 2025, Boyd filed a Form 8-K with the SEC to alert investors and shareholders that the Data Breach represented a material event that could materially affect the value of the company.[5]

42. Although Boyd still has not disclosed precisely the precise nature and scope of the data exfiltrated in the Data Breach, upon information and belief, the data likely consists of PII including names, addresses, phone numbers, email addresses, and dates of birth, as well as driver's license numbers, and Social Security numbers.

43. As a multi-billion-dollar publicly traded company, Boyd had the financial wherewithal and personnel necessary to prevent the Data Breach. Yet it nevertheless failed to adopt adequate data security measures.

**C. Boyd Uses Consumers' PII for Profit-Generating Purposes**

44. Consumers' PII is also valuable to Boyd. Boyd recognizes the business value of PII and collects it to better target customers and increase its profits.

/ / /

[5] *See* Boyd Gaming Corporation Form 8-K, Report of unscheduled material events or corporate event (Sept. 23, 2025), https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=319466252&type=PDF&symbol=BYD&cdn=86c64a989128ed896209a52dfd3d871a&companyName=Boyd+Gaming+Corporation&formType=8-K&dateFiled=2025-09-23.

45. Indeed, as a condition of joining Boyd's "Boyd Rewards" Loyalty Program, Boyd requires that its customers entrust it with highly sensitive PII. Boyd retains and stores this information to use for marketing purposes; to develop, improve, and maintain its properties, products, and services; to expand their business; and many other things.[6]

46. Boyd acknowledges in its privacy policy that it uses consumers' PII for the following purposes:

- To respond to consumer inquiries and fulfill requests (e.g., sending newsletters);
- To send administrative information (e.g., information regarding services, changes to terms, conditions, policies, or your gaming activity);
- To complete and fulfill purchases (e.g., processing payments, confirming reservations, communicating about reservations or purchases, providing related customer service);
- To help consumers engage with mobile apps and online services (e.g., using the Boyd Rewards mobile app, VIP Player Club, finding nearby casinos, participating in online gaming, connecting to gaming machines via mobile device, receiving notifications from the casino);
- To enhance marketing efforts and send marketing communications that may be of interest;
- To personalize experiences by presenting tailored products and offers, and personalizing, advertising, and marketing products and services;
- To allow participation in sweepstakes, contests, and similar promotions, and to administer these activities;
- To allow Loyalty Program members to send messages to other individuals through the services;
- To use geolocation information to send offers, tailored advertisements and promotions, provide location-specific services, confirm jurisdiction for service use, and determine when you enter specific locations for offers, advertisements, or services tailored to that location;
- To support products and services and otherwise support business operations (e.g., developing, improving, and maintaining properties, products, and services; operating and expanding business; conducting audits and internal investigations; research, analytics, and data analysis; accounting; maintaining facilities and infrastructure; quality and safety assurance; determining effectiveness of promotional campaigns; performing identity verification; maintaining records); and
- To comply with laws or legal process, respond to requests from public and government authorities, enforce terms and conditions, monitor, detect, and prevent fraud, and protect

---

[6] Boyd Gaming Corp., *Privacy Policy*, https://www.boydgaming.com/privacy (last visited Oct. 2, 2025).

and defend rights, privacy, property, safety, or operations (including through surveillance).[7]

47. Boyd's self-serving motive to retain and mine its customers' PII for its own financial benefit led to Boyd holding a trove of customer data. Boyd was unjustly enriched by retaining consumers' PII for its own profit motive while failing to adopt reasonable data security measures to protect that PII.

**D. Boyd's Privacy Policy Represents That It Will Adequately Protect PII**

48. Boyd's Privacy Policy on its website at the time of the Data Breach touted its purported data security safeguards. The Privacy Policy made materially false and misleading representations and omissions to Class Members. At the time of the Data Breach, Boyd's Privacy Policy stated the following, in relevant part:

> **Privacy Policy**
> **Current as of March 18, 2025**
>
> Boyd Gaming Corporation ("we," "us," or "our") knows that privacy matters. We use information about you to improve and personalize the services we offer you to make your experience with us as rewarding as possible. This privacy policy (the "Privacy Policy") describes how we handle information collected online via websites operated by us, software applications made available by us, social media pages that we control, mobile applications we control, email messages that we send to you, and the information we collect and use to provide you with the best experience we can offer in connection with our gaming and hotel systems, vacation booking services, and loyalty programs such as the Boyd Rewards Loyalty Program (collectively, the "Services").
>
> * * *
>
> **WHAT PERSONAL INFORMATION WE COLLECT**
>
> "**Personal Information**" is information that is linked or reasonable linked to you as an identifiable individual. Without Personal Information, we may not be able to provide you with all requested services. We may collect the following categories of Personal Information:

/ / /

[7] *Id.*

***Information You Provide Directly to Us:***

- **Identifiers**, including name, contact information, social media information, government-issued identifier (social security numbers, driver's license number, license plate number), and contact information including postal address (billing and shipping addresses); email address; telephone number; social media account ID; and Boyd Rewards account number and other loyalty program information.
- **Pictures and recordings of you**, including profile pictures, and audio, electronic, visual, and similar information.
- **Financial information**, including credit and debit card numbers and banking and financial account information and commercial information such as transaction information, account use history, and purchase history.
- **Biometric data**, such as fingerprints, facial recognition, and other information that permits us to identify an individual.
- **Precise geolocation information**, including precise location based on information from your mobile device, GPS, Wi-Fi, IP address, and other device information, with your consent where required by law and consistent with your mobile device or application permissions.

***Information We Collect Automatically:***

- **Internet or other electronic network activity information**, including device ID, internet protocol (IP) address (and your approximate location derived from your IP address), or other unique personal or online identifiers; browser type, referring / exit pages and URLs, other browser history, platform type, clicks, and other traffic data, pages viewed, the amount of time spent on particular pages; and payment events, and related date and time information.
- If you experience an error, we collect information about the error, the time the error occurred, the feature being used, the state of the application when the error occurred, and any communications or content provided at the time the error occurred. All of this information allows us to understand how the Services are used, improve the Services, and communicate with you, both for customer support and to suggest other products or services that may be of interest to you.

***Information We Collect from Other Sources:***

- We also receive the categories of information described above from other sources, which includes government entities that make information publicly available, entities that sell data, and third-party services and organizations. For example, if you access any social media or similar services through the Services to login or to share information about your experience with our Services with others, we may collect information from these third-party services.

* * *

Some of the categories of information described above may be considered

> "sensitive" under applicable law. In the event we collect sensitive personal information, we collect, use, or disclose it only for purposes permitted under applicable law.
>
> * * *
>
> You can terminate your account at any time. We may, however, keep information about you following termination of your account.
>
> * * *
>
> **SECURITY**
> We are committed to providing security for personal and business information. We use reasonable methods to protect information. Unfortunately, no security measure can be guaranteed 100% secure.
>
> - Email and instant messaging are not recognized as secure communications, so we request that you not send sensitive information to us by email or instant messaging services.
> - Individuals who are granted password access to restricted information on Boyd Gaming websites are prohibited from sharing those passwords with anyone. By accepting password access to a Boyd Gaming website, you agree to protect the password from discovery by anyone else. Boyd Gaming will not be responsible for any damages caused by the unauthorized use of your account. You are responsible for all activities that occur under your account. To protect against anyone acquiring your password, the following security measures are some, but not all, best practices:
>     - Create a strong password.
>     - Never give out your User ID or password.
>     - If you suspect that someone may have figured out your password, or even if you think it might have gotten lost, stolen, copied, or in any other way, compromised, please change it immediately and let us know.
>
> * * *
>
> **DATA RETENTION**
> We will retain your Personal Information for at least as long as needed or permitted for the purpose(s) described in this Privacy Policy and consistent with applicable law.

49. These representations were misleading because, among other things, Boyd did not use reasonable methods to protect information.

/ / /

50. The Privacy Policy also contained material omissions because it failed to disclose that Boyd's data security practices had significant shortfalls regarding its data systems that held consumers' PII.

51. Plaintiffs and Class Members provided their PII to Boyd with the reasonable expectation and mutual understanding that Boyd would take reasonable steps to secure the PII from theft. Boyd failed to do so, in violation of its Privacy Policy and other legal duties discussed below.

**E. Boyd Knew or Should Have Known it Faced a Serious Threat From and Was a Likely Target of Cybercriminals**

52. The type of PII collected by the hospitality and accommodation industry, makes it particularly appealing to cybercriminals.

53. In recent years, Caesars, Choice Hotels, Hard Rock Hotel, Hilton, Hyatt, Kimpton, Marriott, Millennium, MGM, Omni, Radisson, Starwood, and Wyndham, among others, have all experienced data breach incidents.

54. While hospitality companies have fewer transactions than retail organizations—and thus have data on fewer customers to steal—they collect substantially more valuable and varied personal data for each of their guests. This rich personal data is invaluable to cybercriminals. They can use this data to better impersonate each breached customer, leading to additional identity theft and social engineering attacks. By enabling further attacks, breaching a hotel provides cybercriminals much more value than breaching a company in almost any other industry.[8]

55. The high risk of data breaches in the hotel industry was widely known throughout

[8] Nirmal Kumar, *Cybersecurity in Hospitality: An Unsolvable Problem?*, HospitalityBiz (June 27, 2018) (now removed), https://web.archive.org/web/20211017182154/http://www.hospitalitybizindia.com/detailNews.aspx?aid=28970&sid=42; *The challenges of hospitality cybersecurity: An unsolved problem?*, Deccan Chronicle (Aug. 23, 2018), https://www.deccanchronicle.com/technology/in-other-news/230818/the-challenges-of-hospitality-cybersecurity-an-unsolved-problem.html; *Cybersecurity in hospitality—a growing issue?*, CyberSmart (Mar. 23, 2021), https://cybersmart.com/2021/03/cybersecurity-in-hospitality-a-growing-issue/.

the field, including to Boyd.

56. Indeed, Boyd acknowledged in its December 31, 2024 Form 10-K that the "collection of customer and employee personal information imposes various privacy compliance-related obligations on our business and increases the risks associated with a breach or failure of the integrity of our information technology systems."[9]

57. Thus, Boyd was clearly aware of the high risk of data intrusions and the magnitude of the harm that could result from a breach. Despite the known risks, Boyd failed to adopt reasonable safeguards to protect Class Members' PII.

**F. Boyd Failed to Comply with Established Cybersecurity Frameworks and Industry Standards.**

58. The FTC has promulgated various guides for businesses, which highlight the importance of implementing reasonable and adequate data security practices. According to the FTC, the need for data security should be factored into all business decisionmaking.[10]

59. In 2016, the FTC updated its publication titled *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[11] The guidelines noted that:

(a) Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it";

(b) Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

[9] *See* Boyd Gaming Corporation Form 10-K for the year ended Dec. 31, 2024, *supra* note 2.

[10] *See Start With Security: A Guide for Business*, FTC, June 2015, https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited July 26, 2024).

[11] *See Protecting Personal Information: A Guide for Business*, FTC, Oct. 2016, https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last visited July 26, 2024).

(c) Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

(d) Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

(e) Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

60. In another publication, the FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[12]

61. The FTC has brought many enforcement actions against businesses for failing to adequately protect customer data.

62. Importantly for current purposes, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

64. In its 2019 Privacy & Data Security Update, the FTC noted that, "[s]ince 2002, the FTC has brought more than 70 cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data."[13]

---

[12] *See Start With Security*, *supra* note 10.

[13] *See Privacy & Data Security Update: 2019*, FTC, 2020, https://www.ftc.gov/system/files/documents/reports/privacy-data-security-update-2019/2019-privacy-data-security-report-508.pdf (last visited July 26, 2024).

65. In this case, Boyd was fully aware of its obligation to use reasonable and adequate measures to protect consumers' PII, acknowledging as much in its Privacy Policy. Boyd also knew it was a ripe target for hackers. But despite understanding the risks and consequences of inadequate data security, upon information and belief, Boyd failed to comply with FTC data security obligations.

66. Boyd's failure to adopt reasonable safeguards to protect PII constitutes an unfair act or practice under Section 5 of the FTC Act, 15 U.S.C. § 45.

67. Similarly, the National Institute of Standards and Technology (NIST) provides basic network security guidance enumerating steps to take to avoid cybersecurity vulnerabilities.[14] The NIST guidelines provide valuable insights and best practices to protect network systems and customer data.

68. NIST guidance includes recommendations for risk assessments, risk management strategies, system access controls, training, data security, network monitoring, breach detection, and mitigation of existing anomalies.[15]

69. Further, cyber security experts have promulgated a series of best practices that should be implemented by hotels, including the following:

(a) Installing appropriate malware detection software;

(b) Monitoring and limiting network ports;

(c) Protecting web browsers and email management systems;

(d) Setting up network systems such as firewalls, switches and routers;

(e) Monitoring and protection of physical security systems; and

[14] *See Framework for Improving Critical Infrastructure Cybersecurity*, Nat'l Inst. of Standards and Tech. (Apr. 16, 2018), Appendix A, Table 2, https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf. A new framework was published in 2024, after the Data Breach. *See* CSF 2.0 Resource Center, https://www.nist.gov/cyberframework (last visited July 28, 2024).

[15] *Id*. at Table 2 p. 26–43.

(f) Training hotel staff regarding critical points.[16]

70. Boyd has, thus far, concealed the specific details of how vulnerabilities were exploited in its data systems.

71. Boyd's failure to protect Plaintiffs and Class Members' PII illustrates Boyd's failure to adhere to the spirit and letter of the FTC guidelines, NIST guidance, and industry best practices.

**G. Plaintiffs and Class Members Suffered Damages**

72. Boyd's failure to keep the PII of Plaintiffs and Class Members secure has severe ramifications. Plaintiffs and Class Members face a high risk of misuse of their PII from the Data Breach. Upon information and belief, the hackers stole PII from Boyd with the specific intent to use it for illicit purposes and/or sell it to others to be misused.

73. Plaintiffs' PII is now in the hands of criminals, permanently.

74. Plaintiffs received Boyd's breach notice in late September 2025, and in response, spent time monitoring credit and financial accounts and addressing increased spam and phishing communications.

75. Plaintiffs anticipate future costs to protect themselves against identity theft.

76. He has also suffered the loss of his valuable time and opportunity; anxiety and distress; invasion of his privacy; diminution in the value of his PII; and loss of the benefit of his bargain with Boyd, whose services were expected to be accompanied by reasonable data security.

77. Class Members likewise have suffered and will continue to suffer: (a) the increased and continuing risk of identity theft and fraud; (b) time and out-of-pocket expenses to prevent, detect, and remediate misuse of their PII; (c) loss of value of their PII; (d) loss of benefit of the bargain; and (e) other economic and non-economic harms.

78. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their financial and other accounts for fraud, researching and disputing

---

[16] *See How to Work on Hotel Cyber Security*, Open Data Sec. (July 23, 2019), https://opendatasecurity.io/how-to-work-on-hotel-cyber-security/.

suspicious or fraudulent activity, obtaining and reviewing credit reports, placing credit freezes on their credit profiles, dealing with spam and phishing emails, text messages, and phone calls, and reviewing their financial affairs more closely than they otherwise would have, among other things. These efforts are burdensome and time-consuming and would not have been necessary but for Boyd's data security shortfalls.

79. Even in instances where a Class Member is reimbursed for a financial loss due to fraud, that does not make the individual whole again because there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to fraud and identity theft.[17]

80. Plaintiffs and Class Members have also suffered a loss of value of PII.

81. A robust market exists for stolen PII, which is sold and distributed on the dark web and through illicit criminal networks at specific, identifiable prices. Cybercriminals routinely market stolen PII online, making the information widely available to criminals across the world.

82. For example, stolen driver's license numbers can be sold for between $10 and $35 each.[18]

83. Stolen PII is a valuable commodity to identity thieves. The purpose of stealing large blocks of PII is to use it for illicit purposes or to sell it and profit from other criminals who buy the data and misuse it.

84. The U.S. Attorney General stated in 2020 that consumers' sensitive personal

[17] *See Victims of Identity Theft*, DOJ (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf

[18] *See* Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec, 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/; *How Cybercriminals Make Money*, Keeper, https://www.keepersecurity.com/how-much-is-my-information-worth-to-hacker-dark-web.html (last visited July 26, 2024).

information commonly stolen in data breaches "has economic value."[19] The Information Commissioner's Office in the European Union, when investigating a hotel data breach at Marriott, noted that "[p]ersonal data has a real value so organi[z]ations have a legal duty to ensure its security."[20]

85. Nevada law, too, acknowledges that personal information has intrinsic monetary value. Specifically, Nev. Rev. Stat. § 597.810 provides for statutory damages of $750 for unauthorized commercial use of a person's name, voice photograph, or likeness by companies conducting business in Nevada.

86. The value of personal information is increasingly evident in our digital economy. Many companies, including Boyd, collect personal information for purposes of data analytics and marketing. Boyd recognizes the value of personal information, collects it to better target customers to increase its profits, and shares it with third parties for similar purposes, discussed above.

87. One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[21]

88. Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not from a price at which consumers themselves seek to sell it, but rather from the economic benefit consumers derive from being able to use it. A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open

---

[19] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, DOJ (Feb. 10, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military.

[20] *See Intention to Fine Marriott International, Inc More Than £99 Million Under GDPR for Data Breach*, ICO News (July 9, 2019), https://edpb.europa.eu/news/national-news/2019/ico-statement-intention-fine-marriott-international-inc-more-ps99-million_en.

[21] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets*, 15 Rich. J. L. & Tech. 11, 14 (2009).

an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII leads to a loss of the value of the PII.

89. Beyond the immediate risk of actual harm, consumer victims of data breaches also lose the ability to negotiate sharing their PII for services, as their PII has value, and they have been deprived of that negotiated value because it was shared with an unauthorized third party without their consent. As a result, their PII may be used in the future for unauthorized purposes because of this Data Breach.[22]

90. Plaintiffs and Class Members also suffered "benefit of the bargain" damages.

91. Plaintiffs overpaid for Boyd's services that should have been—but were not—accompanied by adequate data security. One component of the cost of Class Members' use of Boyd's services was the implicit promise it made to protect Class Members' PII.

92. Part of the price consumers paid to Boyd was intended to be used to provide adequate data security. Boyd did not do so. Thus, consumers did not get what they paid for.

93. Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those that do not, and vice versa. Indeed, if consumers did not value data security and privacy, Boyd would have no reason to tout its data security efforts in its Privacy Policy.

94. Had consumers known the truth about Boyd's deficient data security practices, they would not have stayed at Boyd properties or enrolled in the Boyd Rewards program or would have paid less than they did for their rooms.

95. Plaintiffs and Class Members did not receive the benefit of their bargain because they paid for data security safeguards they expected but did not receive.

---

[22] *See, e.g.,* James K. Wilcox, *Internet Providers Funded Campaign Yielding Millions of Fake Net Neutrality Comments, New York State Says*, Consumer Reps. (May 6, 2021), https://www.consumerreports.org/electronics/net-neutrality/internet-providers-campaign-fake-net-neutrality-comments (noting how "lead generators" used information stolen from data breaches to create comments purportedly from those individuals victimized in the data breach supporting the termination of net neutrality, without obtaining consent or approval to make those comments).

96. Plaintiffs and Class Members are entitled to monetary compensation for the various types of damages discussed above.

97. They are also entitled to payment for a robust set of identity protection services, including credit monitoring. Such services are reasonable and necessary here. The stolen PII is historical in nature and can be used for identity theft and other types of financial fraud. There is no question that the PII was taken by sophisticated cybercriminals, increasing the risks to Class Members.

98. Although Boyd offered to provide credit monitoring to all recipients of the Data Breach notice, it has agreed to provide that service for only two years. This is entirely insufficient to protect Plaintiffs and Class Members from the consequences of identity theft, which are serious and long-lasting. Experts recommend that data breach victims obtain identity protection services for many years after a data breach. Additionally, there is a benefit to early detection and monitoring. Annual subscriptions for comprehensive identity protection services that include three-bureau credit monitoring, alerts on credit inquiries and new account openings, fraud resolution services, dark web monitoring, and identity theft insurance range from $219 to $329 per year.[23] Boyd must provide monetary compensation to Class Members to pay for these services for their lifetimes.

**H. Criminals Will Continue to Use Class Members' Stolen PII for Years**

99. The risk of fraud following a data breach like this one persists for years. Identity thieves often hold stolen data for months or years before using it, to avoid detection and maximize profits. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because data is often broken into smaller batches when sold or re-sold to appeal to different types of buyers. In addition, stolen data may be distributed through off-line criminal networks and syndicated to be used for crime near where the victim resides.

---

[23] *See* Robert McMillan & Deepa Seetharaman, *Facebook Finds Hack Was Done by Spammers, Not Foreign State,* Wall Street J. (Oct. 17, 2018), https://www.wsj.com/articles/facebook-tentatively-concludes-recent-hack-was-perpetrated-by-spammers-1539821869 .

100. According to a Government Accountability Office Report, the threat of future identity theft lingers for a substantial period of time after a data breach given the time lag between when information is stolen and when it is used:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

101. Another source, discussing a similar data breach of Boyd's competitor MGM Resorts International, stated: "[A]s with many breaches, malicious actors sometimes wait months or years to tip their hand. . . . This is a great example of how these breaches and their fallout can continue to haunt businesses for quite some time."[25]

102. Accordingly, Class Members may not see the full extent of identity theft or misuse of their personal information for years to come. They face an ongoing risk and must vigilantly monitor their financial and other accounts indefinitely.

103. Moreover, even after Class Members' PII is misused, it may take months or years for them to become aware of the misuse. This complicates the process of disputing and correcting the misuse of their data.

### I. PII Stolen in This Data Breach Can be Combined with Data Acquired Elsewhere to Commit Identity Theft

104. Identity thieves can combine PII stolen in the Data Breach with information gathered from other sources such as public sources or even the consumer's social media accounts, to commit identity theft. Thieves can then use the combined data profile to commit fraud including,

---

[24] *See* U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (2007). .

[25] *See* Doug Olenick, *MGM Admits to 2019 Data Breach Affecting 10.6 Million Customers*, SC Magazine (Feb. 20, 2020), *available at* https://www.scmagazine.com/news/mgm-admits-to-2019-data-breach-affecting-10-6-million-customers (last visited July 29, 2024).

among other things, opening new financial accounts or taking out loans in the consumer's name, using the consumer's information to obtain government benefits, filing fraudulent tax returns using the consumer's information and retaining the resulting tax refunds, obtaining a driver's licenses in the consumer's name but with another person's photograph, and giving false information to police during an arrest.

105. A federal district court has explained the process as follows:

> The threat of identity theft is exacerbated by what hackers refer to as "fullz packages." A fullz package is a dossier that compiles information about a victim from a variety of legal and illegal sources. Hackers can take information obtained in one data breach and cross-reference it against information obtained in other hacks and data breaches. So, for example, if a hacker obtains a victim's . . . health information from UnityPoint, the hacker can combine it with the same victim's Social Security number and phone number from a different data breach. This allows the hacker to compile a full record of information about the individual, which the hacker then sells to others as a package.

*Fox v. Iowa Health Sys*., 399 F. Supp. 3d 780, 789 (W.D. Wis. 2019).

106. Thieves can also use PII from the Data Breach, alone or in combination with other information about the consumer, to send highly targeted spear-phishing emails to the consumer to obtain more sensitive information. Spear phishing involves sending emails that look legitimate and are accompanied by correct personal and other information about the individual. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Bank of America, Amazon, or even a government entity), the individual provides sensitive information requested in the email. This could include login credentials, account numbers, or various other types of information.

107. Identity thieves can also use PII from the Data Breach in a "SIM swapping" attack to take control of consumers' phone numbers, allowing them to bypass 2-factor authentication to access the consumer's most sensitive accounts. In other words, fraudsters can use breached PII to convince the consumer's mobile phone carrier to port-over the person's mobile phone number to a phone that the hacker controls. A journalist discussing a similar Data Breach of Boyd's competitor MGM described this scheme as follows:

> Exposed phone numbers create an additional risk: SIM swapping. In these scams, criminals use the data they've gathered about a potential victim to convince wireless carriers to move a number to a different phone. The goal is to intercept two-factor authentication codes that are delivered by SMS.[26]

**J. Plaintiffs and Class Members are Entitled to Injunctive Relief**

108. Boyd acted on grounds that apply generally to the Class as a whole. Thus, injunctive relief is appropriate on a class-wide basis.

109. Plaintiffs and Class Members are entitled to injunctive relief requiring Boyd to, among other things:

(a) Strengthen its technical and administrative information security controls and adequately fund them for several years;

(b) Submit to regular, independent System and Organization Controls 2 ("SOC 2") Type 2 audits of its enterprise data networks and all security-relevant systems, with scoping and assertion statement established by an independent assessor;

(c) Promptly implement all remediation measures recommended by the SOC 2, Type 2 assessor and any other forensic analysis or incident response entities retained to address the Data Breach;

(d) Implement tokenization or column-level encryption of sensitive PII in all databases;

(e) Delete all PII from non-production database environments;

(f) Appoint an independent, qualified cyber security professional to ensure Boyd's compliance with the injunctive relief ordered by the Court, which cost will be borne completely by Boyd.

110. These measures are necessary to guard against future data breaches at Boyd involving Class Members' PII that Boyd continues to retain.

[26] *See* Lee Matthews, *For Sale: Hacked Data On 142 Million MGM Hotel Guests*, Forbes (July 14, 2020), https://www.forbes.com/sites/leemathews/2020/07/14/mgm-142-million-guests-hacked/?sh=1ca9d7125294.

## V. CLASS ACTION ALLEGATIONS

111. Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4).

112. Plaintiffs seek certification of the following nationwide class:

**Nationwide Consumer Class:** All persons who are not present, or former employees of Boyd Gaming Corporation, residing in the United States, whose PII was accessed in the Data Breach.

**Nationwide Employee Class:** All present or former employees of Boyd Gaming Corporation, residing in the United States, whose PII was accessed in the Data Breach.

113. The Nationwide Consumer Class asserts claims against Boyd for Negligence (Count I), Negligence Per Se, (Count II), Breach of Implied Contract (Count III), Unjust Enrichment (Count IV), and violation of the Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600 (Count V).

114. The Nationwide Employee Class asserts claims against Boyd for Negligence (Count I), Negligence Per Se, (Count II), Breach of Implied Contract (Count III), and Unjust Enrichment (Count IV).

115. Under the Restatement (Second) of Conflict of Laws §§ 145 and 188, adopted by Nevada courts and applies to the facts here, Nevada substantive law controls the common law tort and contract-based claims of Plaintiffs, regardless of Plaintiffs' state of residency.

116. The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600, may be applied on a nationwide basis because Boyd's unlawful conduct was centered in Nevada.

117. In addition, or in the alternative, Plaintiffs also seeks certification of a statewide subclass under Virginia law:

**Virginia Subclass:** All residents of Virginia whose PII was accessed in the Data Breach.

118. The statewide subclass asserts statutory claims for violations of the Virginia

Personal Information Breach Notification Act, Va. Code. Ann. §§ 18.2-186.6, *et seq*. (Count XVII), and the Virginia Consumer Protection Act. Va. Code Ann. §§ 59.1-196, *et seq*. (Count XVIII).

119. Excluded from the Nationwide Class and all Subclasses (collectively the "Class") are Defendant's executive officers and directors, the judges to whom this case is assigned, their immediate family members, and court room staff.

120. Plaintiffs reserve the right to amend the definitions of the Classes after having an opportunity to conduct discovery.

121. ***Numerosity: Fed. R. Civ. P. 23(a)(1).*** Upon information and belief, the Nationwide Class and statewide Subclass are each so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, the class size can be determined by information available in Boyd's records, which will be a subject of discovery. On information and belief, there are millions of Class Members in the Nationwide Class, and at least thousands of Class Members in the Virginia state Subclass.

122. ***Commonality: Fed. R. Civ. P. 23(a)(2).*** There are many "questions of law or fact" common to the Class for purposes of Rule 23(a)(2), including but not limited to:

(a) Whether Boyd's data security systems prior to the Data Breach complied with applicable data security laws, regulations, industry standards, and other relevant requirements;

(b) Whether Boyd owed a duty to Plaintiffs and Class Members to safeguard their PII;

(c) Whether Boyd breached its duty to Plaintiffs and Class Members to safeguard their PII;

(d) Whether Boyd knew or should have known that its data security systems were deficient prior to the Data Breach;

(e) Whether Boyd detected the Data Breach in a timely manner;

(f) Whether Boyd had a contractual obligation, based on its Privacy Policy or otherwise, to adopt reasonable data security measures;

(g) Whether Boyd failed to provide timely and adequate notice of the Data Breach to Class Members;

(h) Whether Boyd's conduct constituted violations of state consumer protection statutes and state data security and breach notification statutes;

(i) Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach; and

(j) Whether Plaintiffs and Class Members are entitled to injunctive relief.

123. ***Typicality: Fed. R. Civ. P. 23(a)(3).*** Typicality is satisfied because the claims of Plaintiffs and all Class Members derive from the same operative facts. Plaintiffs and Class Members all had their PII stolen in the Data Breach. Plaintiffs and Class Members have the same basic legal claims against Boyd.

124. ***Adequacy of Representation: Fed R. Civ. P. 23(a)(4).*** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs has retained competent counsel who are highly experienced in data breach class actions and other complex litigation. Plaintiffs and his counsel are committed to prosecuting this action vigorously on behalf of the Class. Plaintiff's counsel has the financial and personnel resources to litigate this matter through all phases of pretrial litigation, trial, and any necessary appeals. Neither Plaintiffs nor his counsel have any interests that are contrary to, or conflict with, those of the Class.

125. ***Predominance: Fed. R. Civ. P. 23(b)(3).*** Boyd has engaged in a common course of conduct toward all Class Members. The common issues identified above arising from Boyd's conduct predominate over any issues affecting only individual Class Members. The common issues hinge upon Boyd's conduct rather than that of any individual plaintiff or class member. Adjudication of the common issues in a single action has important and desirable advantages that will lead to judicial economy.

126. ***Superiority: Fed. R. Civ. P. 23(b)(3).*** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law of fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would find that the cost of litigating their individual claims is prohibitively high and they would therefore have no realistic means to a remedy on an individual

non-class basis. The litigation of separate actions by consumers would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for Boyd. In contrast, conducting this action on a class-wide basis presents fewer management difficulties, conserves judicial and party resources, and pursues the rights of all Class Members in a single proceeding.

127. ***Injunctive Relief: Fed. R. Civ. P. 23(b)(2).*** Boyd acted on grounds that apply generally to the Class as a whole. Boyd continues to retain Class Members' PII, which is subject to potential future data breaches in Boyd's hands. Injunctive relief is appropriate on a class-wide basis.

128. ***Certification of Issues: Fed. R. Civ. P. 23(c)(4).*** In the alternative, Plaintiffs request that the Court certify the case to proceed as a class action on particular issues, as described herein, which would substantially advance the litigation to trial.

## VI. CAUSES OF ACTION

### CLAIM FOR RELIEF I

### NEGLIGENCE

***Brought by Plaintiffs on behalf of the Nationwide Consumer Class and the Nationwide Employee Class, or, in the Alternative, Negligence According to the Applicable State Subclasses***

129. Plaintiffs re-allege and incorporates by reference Paragraphs 1 through 129 as if fully set forth herein.

130. As a condition of receiving Boyd's services and/or employment, Plaintiffs and all Class Members were obligated to provide Boyd with their PII.

131. Plaintiffs and Class Members entrusted their PII to Boyd with the understanding that Boyd would take reasonable measures to safeguard their PII.

132. Boyd had knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could face if their PII was stolen in a data breach.

133. Boyd had a duty to exercise reasonable care in safeguarding, securing, and protecting Class Members' PII. This duty included, among other things, designing, maintaining,

and testing Boyd' data security procedures to ensure that the PII was adequately protected, that cloud-based safeguards were adequately implemented, and that employees tasked with maintaining PII were adequately trained on cyber security measures.

134. Boyd's duty of care arose from, among other things:

- the special relationship that existed between Boyd and its customers because, *e.g.*, Boyd was in an exclusive position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur;
- the special relationship that existed between Boyd and its employees because, *e.g.*, Boyd was in an exclusive position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur;
- Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;
- Boyd's representations in its Privacy Policy;
- General common law duties to adopt reasonable data security measures to protect customer PII and to act as a reasonable and prudent person under the same or similar circumstances would act; and

135. State statutes requiring reasonable data security measures, including but not limited to Nev. Rev. Stat. § 603A.210, which states that businesses possessing personal information of Nevada residents "shall implement and maintain reasonable security measures to protect those records from authorized access."

136. Boyd was subject to an "independent duty," untethered to any express contract between Boyd and Class Members. Sources of the independent duty are included in the list above.

137. Boyd's violation of the FTC Act and state data security statutes constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiffs' negligence claim. Those statutes were designed to protect a group to which Plaintiffs belong and to prevent the type of harm that resulted from the Data Breach.

138. Plaintiffs and Class Members were the foreseeable victims of Boyd's inadequate data security practices. Boyd knew that a breach of its systems could cause harm to Plaintiffs and Class Members.

139. Boyd's conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Boyd's misconduct included its failure to adequately restrict access to its cloud server that held Class Members'' PII.

140. Boyd knew or should have known of the inherent risks in collecting and storing PII, the importance of providing adequate data security, and the frequent cyberattacks aimed at the hotel industry.

141. Plaintiffs and Class Members had no ability to protect their PII once it was in Boyd's possession and control. Boyd was in an exclusive position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

142. Boyd, through its actions and inactions, breached its duties owed to Plaintiffs and Class Members by failing to exercise reasonable care in safeguarding their PII while it was in Boyd's possession and control.

143. Boyd inadequately safeguarded the PII it stored in deviation of standard industry rules, regulations, and best practices at the time of the Data Breach.

144. But for Boyd's breach of duties, Plaintiffs' and Class Members' PII would not have been stolen by threat actors.

145. There is a close temporal and causal connection between Boyd's failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiffs and Class Members.

146. As a result of Boyd's negligence, Plaintiffs and Class Members suffered and will continue to suffer the various types of damages alleged herein—including, but not limited to, significant risk of substantial and immediate future harm, identity theft and fraud, additional time, resources, and money spent on mitigation efforts, increased phishing and attempts at fraud, and further loss of value of personal information.

147. Due to Defendant's conduct, Plaintiffs and Class Members are also entitled to identity protection and credit monitoring. Identity protection and credit monitoring is reasonable here. The PII taken can be used towards identity theft and other types of financial fraud against the Class Members. There is no question that this PII was taken by sophisticated cybercriminals increasing the risks to the Class Members. The consequences of identity theft are serious and long-lasting. There is a benefit to early detection and monitoring. Some experts recommend that data breach victims obtain credit monitoring services for many years after a data breach. Annual subscriptions for comprehensive credit monitoring plans that include inquiry alerts, credit locks, and identity theft insurance range from $219 to $329 per year.[27]

148. Plaintiffs and Class Members are entitled to all forms of monetary compensation and injunctive relief set forth above.

## <u>CLAIM FOR RELIEF II</u>

## BREACH OF IMPLIED CONTRACT

***Brought by Plaintiffs on behalf of the Nationwide Consumer Class and the Nationwide Employee Class***

149. Plaintiffs re-allege and incorporates by reference Paragraphs 1 through 129 as if fully set forth herein.

150. When Plaintiffs and Class Members provided consideration and PII to Boyd in exchange for Boyd's services, they entered into implied contracts with Boyd under which Boyd agreed to adopt reasonable steps to protect their PII.

151. Boyd solicited and invited Plaintiffs and Class Members to purchase its services. As part of that process, Plaintiffs and Class Members were required to provide their PII.

152. Boyd solicited and required Class Members to provide PII as part of the application for employment and/or employment process.

153. When entering into the implied contracts, Plaintiffs and Class Members reasonably

[27] McMillan, *supra* n. 60.

believed and expected that Boyd would implement reasonable and adequate data security measures and that Boyd's data security practices complied with relevant laws, regulations, and industry standards. Boyd knew or reasonably should have known that Plaintiffs and Class Members held this belief and expectation.

154. When entering into the implied contracts, Boyd impliedly promised to adopt reasonable data security measures. Boyd required Class Members to provide their PII during the reservation and/or check-in process. In doing so, Boyd made implied or implicit promises that its data security practices were reasonably sufficient to protect Class Members' PII. By virtue of accepting Plaintiffs' PII during the reservation and check-in process, Boyd implicitly represented that its data security processes were reasonably sufficient to safeguard the PII.

155. Boyd's conduct in requiring Class Members to provide PII as a prerequisite to the use of Boyd's services illustrates Boyd's intent to be bound by an implied promise to adopt reasonable data security measures.

156. Plaintiffs and Class Members would not have provided their PII to Boyd in the absence of Boyd's implied promise to keep the PII reasonably secure.

157. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Boyd. They provided consideration and their PII to Boyd in exchange for Boyd's services and its implied promise to adopt reasonable data security safeguards.

158. Boyd breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures.

159. As a result of Boyd's conduct, Plaintiffs and Class Members have suffered, and continue to suffer, legally cognizable damages arising from the Data Breach as set forth above in Section II.A.

160. Plaintiffs and Class Members are entitled to all forms of monetary compensation and injunctive relief set forth herein.

/ / /

## CLAIM FOR RELIEF III

## UNJUST ENRICHMENT

***Brought by Plaintiffs on behalf of the Nationwide Consumer Class and the Nationwide Employee Class***

161. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 129 as if fully set forth herein.

162. This claim is plead in the alternative to the breach of implied contract claim.

163. Plaintiffs and Class Members conferred monetary benefits on Boyd.

164. In exchange, Plaintiffs and Class Members should have received Boyd's services as well as adequate safeguarding of their PII.

165. Boyd profited from its transactions with Class Members in two ways. First, Boyd received monetary consideration as revenue. Second, Boyd used Class Members' PII for a variety of profit-generating purposes beyond simply providing its services. Boyd used the PII for marketing and other purposes discussed more fully above. Boyd used the PII to generate future stays from Class Members and derive future revenues and profit.

166. The money Plaintiffs and Class Members paid to Boyd was intended to be used by Boyd, in part, to fund Boyd's costs of providing reasonable data security.

167. Boyd failed to provide reasonable data security, yet it kept all monies paid by Plaintiffs and Class Members.

168. Boyd knew that Plaintiffs and Class Members conferred monetary and other benefits on Boyd. Boyd accepted those benefits.

169. Under principles of equity and good conscience, Boyd should not be permitted to retain the full monetary benefit of its transactions with Plaintiffs and Class Members. Boyd failed to adequately secure consumers' PII and, therefore, did not provide the full services that Class Members paid for.

170. Boyd acquired Class Members' money and PII through inequitable means in that it failed to disclose its inadequate data security practices when entering into transactions with Class Members and obtaining their PII.

171. If Plaintiffs and Class Members would have known that Boyd employed inadequate data security safeguards, they would not have agreed to provide Boyd with their PII or required Boyd to increase their security.

172. Class Members have no adequate remedy at law. Boyd continues to retain Class Members' PII while exposing the PII to a risk of future data breaches while in Boyd's possession. Boyd also continues to derive a financial benefit from using Class Members' PII.

173. As a direct and proximate result of Boyd's conduct, Plaintiffs and Class Members have suffered the various types of damages alleged herein.

174. Boyd should be compelled to disgorge into a common fund or constructive trust, for the benefit of Class Members, the proceeds that they unjustly received from Class Members. In the alternative, Boyd should be compelled to refund the amounts that Class Members overpaid for Boyd's services.

**CLAIM FOR RELIEF IV**

**VIOLATION OF THE NEVADA CONSUMER FRAUD ACT**

**Nev. Rev. Stat. § 41.600**

***Brought by Plaintiffs on behalf of the Nationwide Class***

175. Plaintiffs re-allege and incorporates by reference Paragraphs 1 through 129 as if fully set forth herein.

176. The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600, states:

> 1. An action may be brought by any person who is a victim of consumer fraud.
>
> 2. As used in this section, "consumer fraud" means: . . . (e) A deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.

177. In turn, Nev. Rev. Stat. § 598.0923(2) (a section of the Nevada Deceptive Trade Practices Act) states: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: . . . 2) Fails to disclose a material fact in connection with the sale or lease of goods or services." Boyd violated this provision because it failed to disclose the material fact that its data security practices were deficient and that its cloud

server security settings were not adequate to protect consumers' PII. Boyd knew or should have known that its data security practices were deficient. This is true because, among other things, Boyd was aware that the hotel industry was a frequent target of sophisticated cyberattacks. Boyd knew or should have known that its cloud server data security practices were insufficient to guard against those attacks. Boyd had knowledge of the facts that constituted the omission. Boyd could and should have made a proper disclosure when accepting hotel reservations, during the check-in process, in the registration for its Boyd Loyalty Rewards program, during the employment application process, in its Privacy Policy, or by any other means reasonably calculated to inform Class Members of its inadequate data security.

178. Also, Nev. Rev. Stat. § 598.0923(3) states: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: . . . 3) Violates a state or federal statute or regulation relating to the sale or lease of . . . services." Boyd violated this provision for several reasons, each of which is an independent predicate act for purposes of violating § 598.0923(3).

179. *First*, Boyd breached a Nevada statute requiring reasonable data security. Specifically, Nev. Rev. Stat. § 603A.210(1) states: "A data collector that maintains records which contain personal information of a resident of this State shall implement and maintain *reasonable security measures* to protect those records from unauthorized access, acquisition, . . . use, modification or disclosure." (Emphasis added.) Boyd is a data collector as defined under the statute at Nev. Rev. Stat. § 603A.030. Boyd failed to implement and maintain reasonable security measures, evidenced by the fact that hackers accessed its cloud server and stole consumers' PII. Boyd's violation of this statute was done knowingly for purposes of Nev. Rev. Stat. § 598.0923(3). Boyd knew or should have known that its data security practices were deficient. This is true because, among other things, Boyd was aware that the hotel industry was a frequent target of sophisticated cyberattacks. Boyd knew or should have known that its cloud server data security practices were insufficient to guard against those attacks. Boyd had knowledge of the facts that constituted the violation.

180. *Second*, Boyd breached other state statues as alleged herein. Boyd also violated Nev. Rev. Stat. § 598.0923(2) as alleged in this Count. Boyd knew or should have known that it violated these statutes. Boyd's violation of each of these statutes serves as a separate predicate act for purposes of violating Nev. Rev. Stat. § 598.0923(3).

181. *Third*, Boyd violated the FTC Act, 15 U.S.C. § 45, as alleged above. Boyd knew or should have known that its data security practices were deficient, violated the FTC Act, and that it failed to adhere to the FTC's data security guidance for businesses. This is true because, among other things, Boyd was aware that the hotel industry was a frequent target of sophisticated cyberattacks. Boyd knew or should have known that its cloud server data security practices were insufficient to guard against those attacks. Boyd had knowledge of the facts that constituted the violation. Boyd's violation of the FTC Act serves as a predicate act for violating Nev. Rev. Stat. § 598.0923(3).

182. Boyd engaged in deceptive or unfair practices by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Class Members.

183. Plaintiffs and Class Members were denied a benefit conferred on them by the Nevada legislature.

184. Nev. Rev. Stat. § 41.600(3) states that if the plaintiff prevails, the court "shall award: (a) Any damages that the claimant has sustained; (b) Any equitable relief that the court deems appropriate; and (c) the claimant's costs in the action and reasonable attorney's fees."

185. As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered all forms of damages alleged herein in Section II.A. Plaintiffs' harms constitute compensable damages under Nev. Rev. Stat. § 41.600(3).

186. Plaintiffs and Class Members are also entitled to all forms of injunctive relief sought herein.

187. Plaintiffs and Class Members are also entitled to an award of their attorney's fees and costs.

**CLAIM FOR RELIEF V**

**VIOLATION OF THE VIRGINIA PERSONAL INFORMATION BREACH NOTIFICATION ACT**

**Va. Code. Ann. §§ 18.2-186.6, *et seq.***
***Brought by Plaintiff Berger on behalf of the Virginia Subclass***

188. Plaintiff Berger, individually and on behalf of the Virginia Subclass, re-alleges and incorporates by reference all preceding allegations in Paragraphs 1 through 129 as if fully set forth herein.

189. Boyd is required to accurately notify Plaintiffs and Virginia Subclass members following discovery or notification of a breach of its data security system if unencrypted or unredacted Personal Information was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identify theft or another fraud, without unreasonable delay under Va. Code Ann. § 18.2-186.6(B).

190. Boyd is an entity that owns or licenses computerized data that includes Personal Information as defined by Va. Code Ann. § 18.2-186.6(B).

191. Plaintiff's and Virginia Subclass members' Personal Information includes Personal Information as covered under Va. Code Ann. § 18.2-186.6(A).

192. Because Boyd discovered a breach of its security system in which unencrypted or unredacted Personal Information was or is reasonably believed to have been accessed and acquired by an unauthorized person, who will, or it is reasonably believed who will, engage in identify theft or another fraud, Boyd had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Va. Code Ann. § 18.2-186.6(B).

193. By failing to disclose the Data Breach in a timely and accurate manner, Boyd violated Va. Code Ann. § 18.2-186.6(B).

194. As a direct and proximate result of Boyd's violations of Va. Code Ann. § 18.2-186.6(B), Plaintiff and Virginia Subclass members suffered damages, as described above.

195. Plaintiff and Virginia Subclass members seek relief under Va. Code Ann. § 18.2-186.6(I), including actual damages.

## CLAIM FOR RELIEF VI

**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**

**Va. Code Ann. §§ 59.1-196, *et seq.***

***Brought by Plaintiff Berger on behalf of the Virginia Subclass***

196. Plaintiff Berger, individually and on behalf of the Virginia Subclass, re-alleges and incorporates by reference all preceding allegations in Paragraphs 1 through 129 as if fully set forth herein.

197. The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

198. Boyd is a "person" as defined by Va. Code Ann. § 59.1-198.

199. Boyd is a "supplier," as defined by Va. Code Ann. § 59.1-198.

200. Boyd engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Boyd advertised, offered, or sold goods or services used primarily for personal, family or household purposes; or relating to an individual's finding or obtaining employment.

201. Boyd engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, including:

- Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Virginia Subclass members' Personal Information, which was a direct and proximate cause of the Data Breach;
- Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;
- Failing to comply with common law and statutory duties pertaining to the security and

privacy of Plaintiff and Virginia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

- Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Virginia Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;
- Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Virginia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;
- Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Virginia Subclass members' Personal Information; and
- Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Virginia Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

202. Boyd intended to mislead Plaintiff and Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

203. Boyd's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and Virginia Subclass members, about the adequacy of Boyd's computer and data security and the quality of the Boyd brand.

204. Had Boyd disclosed to Plaintiff and Virginia Subclass members that its data systems were not secure and, thus, vulnerable to attack, Boyd would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Boyd received, maintained, and compiled Plaintiffs' and Virginia Subclass members' Personal Information as part of the services Boyd provided and for which Plaintiff and Virginia Subclass members paid without advising Plaintiff and Virginia Subclass members that Boyd's data security practices were insufficient to maintain the safety and confidentiality of

Plaintiffs' and Virginia Subclass members' Personal Information. Accordingly, Plaintiff and the Virginia Subclass members acted reasonably in relying on Boyd's misrepresentations and omissions, the truth of which they could not have discovered.

205. Boyd had a duty to disclose these facts due to the circumstances of this case and the sensitivity and extensivity of the Personal Information in its possession. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff and the Virginia Subclass—and Boyd, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Boyd. Boyd's duty to disclose also arose from its:

- Possession of exclusive knowledge regarding the security of the data in its systems;
- Active concealment of the state of its security; and/or
- Incomplete representations about the security and integrity of its computer and data systems, and its prior data breaches, while purposefully withholding material facts from Plaintiff and the Virginia Subclass that contradicted these representations.

206. The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

- Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
- Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and
- Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

207. Boyd acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiff and Virginia Subclass members' rights. Boyd's past data breaches and breaches within the hospitality industry put it on notice that its security and privacy protections were inadequate. An award of punitive damages would serve to punish Boyd for its wrongdoing, and warn or deter others from engaging in similar conduct.

208. As a direct and proximate result of Boyd's deceptive acts or practices, Plaintiff and Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Boyd as they would not have paid Boyd for goods and services or would have paid less for such goods and services but for Boyd's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

209. Boyd's violations present a continuing risk to Plaintiff and Virginia Subclass members as well as to the general public.

210. Plaintiff and Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation; restitution, injunctive relief; punitive damages; and attorneys' fees and costs.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated individuals, respectfully request the following relief:

(a) An Order certifying this case as a class action;

(b) An Order appointing Plaintiffs as class representatives;

(c) An Order appointing the undersigned counsel as class counsel;

(d) Injunctive relief requiring Boyd to: (i) strengthen its data security systems and procedures; (ii) submit to future annual audits of those systems by a Court-appointed independent auditor; and (iv) delete PII that Boyd no longer needs for processing services previously provided to Class Members;

(e) An award of nominal damages, compensatory damages, money for significant and reasonable credit monitoring, statutory damages, treble damages, and

punitive damages;

(f) An award of Plaintiffs' attorneys' fees and litigation costs; and

(g) Such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: October 6, 2025

Respectfully submitted,

/s/ Michael Gayan
Michael J. Gayan
**Claggett & Sykes Law Firm**
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
Tel. (702) 655-2346
mike@claggettlaw.com

Douglas J. McNamara*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
8th Floor
Washington, D.C. 20005
Tel. (202) 408-4600
dmcnamara@cohenmilstein.com

Amy Keller*
**DICELLO LEVITT LLP**
10 North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214-7900
akeller@dicellolevitt.com

James J. Pizzirusso*
**HAUSFELD LLP**
1201 17th Street N.W., Suite 600
Washington, D.C. 20036
Tel. (202) 540-7200
jpizzirusso@hausfeld.com

* *Pro Hac Vice Applications Forthcoming*